**IN DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION**

| | |
|---|---|
| BARBARA A. GIBSON individually, and as Personal Representative of the Estate of Johnny G. Gibson, JOHN TRAVIS MORGAN GIBSON, and DIXIE LEE GIBSON,<br><br>               Plaintiffs,<br><br>   vs.<br><br>THE UNITED STATES, and DOES 1-10,<br><br>           Defendants. | **CV-18-112-GF-BMM**<br><br><br>**AMENDED FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER** |

This matter came before the Court for trial without a jury on October 15-16, 2019. Plaintiffs Barbara Gibson as personal representative of the Estate of Johnny Gibson and individually, John Travis Morgan Gibson, and Dixie Lee Gibson (collectively "Plaintiffs"), were represented by John Morrison. Defendant United States of America ("Defendant") was represented by Assistant United States Attorney Chad C. Spraker.

The Court originally issued Findings of Fact and Conclusions of Law and Order on January 16, 2020. (Doc. 69.) Defendant timely filed a Motion to Alter Judgment, or in the Alternative for Clarification, pursuant to Fed. R. Civ. P. 59(e)

("Rule 59"), on February 13, 2020. (Doc. 75.) Defendants argue that Montana law imposes a $250,00 cap on non-economic damages in medical malpractice claims. (*Id.* at 1 (citing Mont. Code Ann. § 25-9-411).)

Plaintiffs filed a response (Doc. 78) and a Notice to the Court of Constitutional Challenge (Doc. 82). Plaintiffs' constitutional challenge addresses Montana's medical malpractice non-economic damages cap. Defendants filed a reply. (Doc. 86.) Plaintiffs also have filed what they fashion as a Motion for Declaratory *Ridley* Ruling. (Doc. 84.) This motion contends that Defendants must pay now to Plaintiffs those portions of the judgement for which liability has been proven to be reasonably clear as required under Montana law. (Doc. 85 at 6 (citing *Ridley Guaranty Nat'l Ins. Co.*, 951 P.2d 987 (Mont. 1997)).)

Upon further consideration of the evidence presented at trial, and in light of the pending motions, the Court chooses to exercise its discretion pursuant to Rule 59(e) to amend its previous order. *Allstate Ins. Co. v. Herron*, 634 F.3d 1101, 1111 (9th Cir. 2011)

From the evidence presented, the Court makes the following Amended Findings of Fact and Conclusions of Law:

# FINDINGS OF FACT

## I. Background

1. Barbara Gibson is the surviving spouse of Johnny Gibson and the personal representative of the Estate of Johnny Gibson. (Final Pretrial Order, Doc. 66 at 5.)

2. John Travis Morgan Gibson and Dixie Lee Gibson are the adult children of Johnny Gibson. (*Id.*)

3. Central Montana Community Health Center ("CMCHC") is a federally funded community health center located in Lewistown, Montana. (*Id.* at 3.)

4. Kimberlee D. Decker worked as a Nurse Practitioner at CMCHC. (*Id.*) Decker saw Johnny Gibson at CMCHC on September 14, 2015. (*Id.* at 3-4.) At that time, CMCHC and Nurse Decker were deemed employees of the Public Health Service under 42 U.S.C. § 233(a) and (g). (*Id.* at 4.)

5. Johnny Gibson, born 1952, was seen by Decker at the CMCHC on September 14, 2015, with symptoms that included chest pain, pressure like pain between the shoulder blades, heartburn and fatigue. (*Id.* at 4.) Decker referred Gibson to CMCHC for an ultrasound of his gallbladder. (*Id.*) Decker did not prescribe or perform an EKG or stress test, did not mention potential heart issues in

the medical record, and did not otherwise perform a heart workup or refer Gibson for a heart workup. (*Id.*)

6.      Defendant concedes the issues of negligence regarding the departure from the standard of care by Decker and CMCHC and causation in the form of negligent failure to evaluate and to treat Gibson's heart disease by Decker and CMCHC. Defendant further concedes that the negligence of Decker and CMCHC more probably than not proved a substantial factor in Gibson's death. (Doc. 34 at 6.)

7.      The morning of September 21, 2015, Johnny Gibson said he felt good enough to travel with his family home to Colorado Springs, Colorado. (Doc. 35 ¶ 27.) Barbara and Johnny Gibson and their daughter Dixie Lee Gibson started driving back that day. The family stopped at the Flying J truck stop in Lockwood, Montana because of chest pain that Johnny Gibson was experiencing. Barbara called an ambulance that transported Johnny Gibson to St. Vincent Hospital in Billings, Montana at approximately 9:33 p.m. on September 21, 2015. Johnny Gibson was suffering a myocardial infarction. He died in surgery at St. Vincent's Hospital at 5:27 a.m., on September 22, 2015. (Doc. 66 at 5.)

8.      Proper treatment of Johnny Gibson at CMCHC during his visit on September 14, 2015, would have made it more probable than not that Gibson would have lived a normal life expectancy. *Id.*

## II.      Surviving Family Members

### A. Barbara Gibson

9.      Barbara Gibson was 69 years old at the time of trial. (Trial Tr. Vol. 1, Doc. 64 at 39:5-6.) Barbara met Johnny Gibson when she was 23 years old and married him four months later in April 1973. (*Id.* at 23:11-12.)

10.      Barbara and Johnny Gibson lived in Elbert, Colorado from 2002 to 2012. (*Id.* at 24:23-24.) Barbara, Johnny , and Dixie Lee Gibson lived in Montana during the summers of 2012 through 2015. (*Id.* at 26:19-27:11.)

11.      Barbara Gibson's testimony reflected a good marriage with Johnny Gibson. (*Id.* at 40:25-42:17.) Barbara Gibson has experienced loss of consortium, loss of care, protection, and companionship, aid, comfort, guidance, and society, and grief, sorrow, and mental anguish following her husband's death. (*Id.* at 82:2-89:14.)

### B. Dixie Lee Gibson

12.      Dixie Lee Gibson is Johnny and Barbara Gibson's daughter. (*Id.* at 105:7-8.) Dixie Lee was born in 1981. (*Id.* at 105:13-16.) She lived in the same household as Barbara  and Johnny Gibson and continues to live with Barbara. (*Id.* at 106:23-24.) Dixie Lee and Johnny Gibson did ranch work together before Johnny Gibson's death. (*Id.* at 107:14-16, 108:19-25.) Dixie Lee's testimony reflected a good relationship with her father. (*Id.* at 109:6-113:5.) Dixie Lee

experienced loss of care, protection, and companionship, aid, comfort, guidance, and society, and grief, sorrow, and mental anguish following her father's death. (*Id.* at 118:15-126:5.)

### C. John Travis Morgan Gibson

13.     John Travis Morgan Gibson is Johnny and Barbara Gibson's son. (*Id.* at 127:7-8.) John Travis lives in the Denver, Colorado area with his wife and children. (*Id.* 129:19-20.) John Travis lived with his parents until 2005 when he was 27. (*Id.* at 130:13-131:5.) John Travis and Johnny Gibson worked together as painters and ranch workers. (*Id.* at 132:14-133:8.) John Travis's testimony reflected a good relationship with his father during John Travis's formative years. (*Id.* 132:14-141:14.) John Travis experienced loss of care, protection, and companionship, aid, comfort, guidance, and society, and grief, sorrow, and mental anguish following his father's death. (*Id.* at 150:6-159:1.)

### III.    Damages to the Estate

### A. Loss of Johnny Gibson's Income

14.     Johnny Gibson's 2009 IRS Form W-2 lists wages of $7,943.79. (Ex. 2, Doc. 60-1.)

15.     Johnny Gibson and Barbara Gibson's 2010 tax return lists wages of $4,545. (Ex. 3, Doc. 60-2 at 1.)

16.     Johnny Gibson and Barbara Gibson's 2011 tax return lists gross receipts of $3,337 and a net loss of $913. (Ex. 4, Doc. 60-3 at 1, 4.) Barbara Gibson did not recall whether Johnny Gibson received any income for the tax year 2011 above the gross receipts figure of $3,337. (Trial Tr. Vol. 1, Doc. 64 at 96:15-97:7.)

17.     Johnny Gibson and Barbara Gibson's tax return for the year 2012 lists wages of $8,125. (Ex. 5, Doc.60-4 at 1.)

18.     Johnny Gibson and Barbara Gibson's tax return for the year 2013 lists wages of $10,634. (Ex. 6, Doc. 60-5 at 1.)

19.     Johnny Gibson and Barbara Gibson's tax return for the year 2014 lists business income of $5,000. (Ex. 7, Doc. 60-6 at 1.)

20.     Johnny Gibson and Barbara Gibson's tax return for 2015 lists wages of $6,375. (Ex. 8, Doc. 60-7 at 1.)

21.     Johnny Gibson was not employed apart from late spring to early fall for the years 2012 to 2015. (Trial Tr. Vol. 1, Doc. 64. at 99:12-18.) Barbara Gibson testified that Johnny Gibson ordinarily worked during the winter, but that she and Gibson had taken care of Gibson's mother, then age 93-95, who suffered from broken hips and an injured leg, during the winters of 2012, 2013, and 2014. (*Id.* at 102:14-19).

22.     Barbara Gibson testified that Johnny Gibson's employers sometimes paid him in cash and sometimes paid him in-kind and that she believed his income typically ranged between $10,000 and $25,000 each year. (*Id.* at 34:9-10.) These in-kind payments, especially during their years working and living on the Layne Ranch near Elbert, Colorado, included housing, areas to cultivate their own food, and hunting access to obtain further food stocks.

23.     Plaintiffs called Dr. Ann Adair as an expert witness regarding damages. Adair works an Associate Professor of Economics at Rocky Mountain College. (*Id.* at 160:8-9.) She also operates an economic consulting firm, Yellowstone Economic Associates, where she performs forensic evaluations. (*Id.* at 160:9-11.) Dr. Adair has been doing work as a forensic economist since 1992. (*Id.* at 161:17-19.)

24.     Adair assumed that Johnny Gibson most likely would have a work life until an age of 67 years and 4 months. (*Id.* at 164:4-10.) Adair assumed that Gibson would have lived an additional 18.7 years until an age of 81 years and 9 months. (*Id.* at 164:11-15)

25.     Adair's calculation of past and future earning capacity losses totaled $150,256. (*See* Ex. 34(c).) Adair calculated Gibson's annual earning capacity at $27,310, which represents the mean earning capacity of farm workers in Montana.

(*Id.* at 170:1-3; Ex. 34(b).) Adair derived that figure using a 2,080-hour work year. (Trial Tr. Vol. 2, Doc. 65 at 213:18-22.)

26.     Adair subtracted Gibson's actual earnings of $6,375 from an annual earning capacity of $27,310 to calculate an earning capacity of $20,935 for the year 2015. (Trial Tr. Vol. 1, Doc. 64 at 171:16-18; *see* Ex. 34(d).)

27.     Sean Black, CPA, testified as an expert for Defendant. Black projected $26,450 for loss of past earnings (measured from Gibson's date of death until March 31, 2019) and $17,046 for a loss of future earnings (measured from April 1, 2019 until a retirement age of 68.6) for a total of $43,496. Black used an average of Gibson's reported income in the three years before his death–$8,125 wages in 2012, $10,634 wages in 2013, and $5,000 Schedule C income in 2014– along with an annual growth rate of 2.1 percent.

28.     Gibson and his family appear to have relied, in part, on unreported in-kind payments for his services as a ranch hand. Barbara Gibson testified to that effect. The Court agrees that Gibson's earning capacity, with adjustments for inflation, as opposed to his actual reported income, provides the appropriate method for evaluating Johnny Gibson's loss of future earnings. The Court finds that $160,000 represents a reasonable estimate of the remaining earning capacity of Gibson lost as result of his premature death.

## B. Loss of Gibson's Household Services

29.     Barbara Gibson testified that Gibson performed a long list of household services. (Trial Tr. Vol. 1, Doc. 64 at 70-74.) Adair calculated Gibson's loss of past and future household services at $144,434. (*Id.* at 176:21-25; Ex. 34(c).) Defendant presented no evidence to dispute this amount.

## C. Gibson's Physical Pain and Mental Suffering

30.     Plaintiffs contend that Gibson suffered physical pain and mental and emotional distress as a result of his acute myocardial infarction and the prospect of his death. Nurse Amanda Steiner of St. Vincent's Hospital noted that Gibson told her that his pain was "gradually getting worse starting this morning around 0830. Pain was intermittent, bilat sides, of Sternum, which is sharp, and pressure. Pain was extremely bad at 1730 and pursued additional medical attention." (Ex. 203, Doc. 60-25 at 17.) Gibson rated his pain by that time as a 10/10. (*Id.*)

31.     Dr. Walter Graves, cardiac surgeon, was consulted and noted that Gibson was "in obvious distress from severe chest pain and continues to repeat a request make the pain stop. He is unable to give an intelligible response to other questions." *Id.* at 33. Gibson's medical record reflects that Dr. Graves ordered morphine for Gibson upon his arrival at St. Vincent's Hospital and that the morphine reduced Gibson's pain. (Ex. 509, Doc. 62-10 at 15:5-23; Ex. 16, Doc. 62-2 at 2.) Gibson's medical records further reflect that medical personnel

administered the narcotic Fentanyl to Gibson in the Emergency Department. (Ex. 509, Doc. 62-10 at 19:5-11; Ex. 16, Doc. 62-2 at 13.)

32.     Gibson likely would have experienced similar symptoms and required similar pain relief at CMCHC when evaluated by Decker. The Court recognizes that Gibson likely experienced anxiety and mental suffering at the prospect of emergency bypass surgery. Gibson likely would have faced a similar treatment one week earlier had Decker properly diagnosed Gibson's symptoms. The Court declines to award compensation for this element of damage under these circumstances.

### D. Gibson's Loss of Future Benefits

33.     Adair calculated Gibson's past and future benefit losses of $15,590. (Trial Tr. Vol. 1, Doc. 64 at 178:14-15, 179:9-10; Ex. 34(c).) Adair's loss of benefits figure included Social Security, Medicare, unemployment, and workers' compensation. (Trial Tr. Vol. 1, Doc. 64 at 172:13-16.) Adair calculated Gibson's loss of benefits by computing 9.4 percent of his total compensation. This amount represents what an employer would have been obligated to contribute on behalf of an employee. (*Id.* at 173:8-20.)

34.     Sean Black calculated a loss of employer paid benefits at zero, as he did not see any evidence that Gibson or his estate would receive any of the legally mandated benefits paid to third parties. (Trial Tr. Vol. 2, Doc. 65 at 286:1-22.) The

Court recognizes, however, that Gibson's employer nevertheless would have been obligated to pay these amounts. Further, Gibson potentially could have received some compensation from these benefits in the form of disability payments in the event that his heart problems rendered him unable to work. The Court finds that an award of damages in the adjusted amount of $15,000 to be reasonable to compensate for the loss of benefits to Gibson.

## IV.    Funeral Expenses

35.    Plaintiffs have provided documentary evidence of funeral expenses totaling $8,814. (Ex. 30, Doc. 60-19 at 1-5.) Defendant did not contest the documented funeral expenses.

## V.    Medical Bills

36.    St. Vincent Healthcare's medical bill indicates total charges of $164,670.22 for services at St. Vincent Hospital, and $991.28 in ambulance charges from the Lockwood Rural Fire District, for a total of $165,651.50. (Ex. 32, Doc. 60-21.) The medical bill further lists a December 17, 2015, payment and adjustment of $165,651.50 with a description of "CHARITY – BELOW FPG[.]" (*Id.* at 13.) St. Vincent Healthcare made no effort to collect any medical bills from Barbara Gibson. (Trial Tr. Vol. 1, Doc. 64 at 102:7-9.)

## VI. Value of a Statistical Life

37.     Plaintiffs' expert Ann Adair testified regarding two government reports,—a 2016 U.S. Department of Transportation Memo regarding "Guidance on the Treatment of the Economic Value of a Statistical Life," (Ex. 35, Doc. 60-23) and —a 2019 U.S. Environmental Protection Agency (EPA) document entitled "Mortality Risk Evaluation," (Ex. 36, Doc. 60-24). Adair testified that she had taken both reports from the websites of the respective government agencies. Adair testified that these documents represent two different methods by which U.S. government agencies value human life for policy making and budgeting purposes. Adair claimed that the U.S. government agencies base both reports on evidence concerning the amounts people are willing to pay for small reductions in their risk of dying from adverse health conditions and accidents. In light of these reports, Adair testified that the United States Department of Transportation values a life at $9.6 million and the United States EPA values a human life at $7.4 million in 2006 dollars. Adair claimed that these amounts equate to roughly $9.4 million in 2019 dollars.

## CONCLUSIONS OF LAW

From the foregoing findings of fact, the Court makes the following conclusion of law:

## I.      Jurisdiction and Venue

1.      Plaintiffs filed a Federal Tort Claims Act case arising from alleged medical malpractice by CMCHC in Lewistown, Montana. (Compl., Doc. 1.) Plaintiffs allege that CMCHC failed to properly evaluate and treat Gibson for heart disease resulting in his death a week later. (*Id.*)

2.      The Court possesses jurisdiction under 28 U.S.C. § 1346(b) because this is a civil action that raises claims against Defendant for money damages for personal injury and death caused by the negligent or wrongful act or omission of employees of the government. (Final Pretrial Order, Doc. 66 at 3.)

3.      Plaintiffs fully have exhausted their administrative remedies by filing a Standard Form 95 with the U.S. Department of Health and Human Services ("HHS"). More than six months have passed since the filing of the claim and HHS has not issued a decision. (*Id.*) The Court possesses subject matter jurisdiction of this action, therefore, under 28 U.S.C. § 1346(b)(1). (*Id.*)

4.      Venue is proper in the District Court for the District of Montana, Great Falls Division, under 28 U.S.C. § 1391(b)(2) and Local Rule 3.2(b) as the negligence upon which the subject claims are based occurred in Fergus County, Montana. (*Id.*)

## II.        Negligence and Causation

5.        The same burden of proof applies in a civil action regardless of whether the finder of fact is a judge in a bench trial or a jury. *Cabrera v. Jakabovitz*, 24 F.3d 372, 380 (2d Cir. 1994). When a party has the burden of proving any claim or affirmative defense by a preponderance of the evidence, it means the Court must be persuaded by the evidence that the claim or affirmative defense is more probably true than not true.

6.        Under the FTCA, Defendant stands liable for torts committed by its agencies and employees in the same manner and to the same extent as a private individual under like circumstances, in accordance with the law of the place where the act or omission occurred. 28 U.S.C. § 2674. Applicable state law must be the source of the claim for relief. *Trobetta v. United States*, 613 F. Supp. 169, 169 (D. Mont. 1985).

7.        A negligence claim requires proof of four essential elements under Montana law: (1) duty; (2) breach of duty; (3) causation; and (4) damages. *Wiley v. City of Glendive*, 900 P.2d 310, 312 (Mont. 1995). To establish a duty and breach in a medical negligence claim under Montana law, a plaintiff initially must satisfy a two-part threshold obligation: (1) evidence must be presented to establish the standard of professional care in the type of case involved; and (2) it must be shown

that the physician departed from this recognized standard in his/her treatment of the plaintiff. *See, e.g.*, *Gilkey v. Schweitzer*, 983 P.2d 869, 871 (Mont. 1999).

8.      Moreover, it must be established that the departure from the standard served as the proximate cause of injury to the plaintiff. *Montana Deaconess Hosp. v. Gratton*, 545 P.2d 670, 673 (Mont. 1976); *Falcon v. Cheung*, 848 P.2d 1050, 1055 (Mont. 1993). Defendant has conceded the issues of negligence in terms of Decker's and CMCHC's departure from the standard of care and causation related to the fact that Decker's and CMCHC's negligent failure to evaluate and treat Gibson's heart disease more probably than not represented a substantial factor in his death.

## III.      Contributory Negligence

9.      In medical negligence cases such as this, "comparative negligence does not apply where a patient's pre-treatment behavior merely furnishes the need for care or treatment which later becomes the subject of a malpractice claim." *Harding v. Deiss*, 3 P.3d 1286, 1289 (Mont. 2000). Gibson's health habits before seeking medical treatment are "merely a factor the physician should consider in treating the patient," not evidence of fault that may offset against any negligent acts by Decker and CHCHC. *Id.* The only negligent acts of a patient that may be considered in a comparative negligence scheme are acts contemporaneous with or subsequent to treatment. *Id.*

10.     Defendant asserts the defense of comparative fault based on two grounds: a) that Gibson should have told Decker that his pain was exertional; and b) that Gibson should have sought additional medical attention between his visit to CMCHC on September 14, 2015, and when his family called the ambulance on September 21, 2015.

11.     Defendant first asserts that Mr. Gibson failed to disclose to Decker that his chest pain had been exertional, that he had been having more frequent episodes in the last two months, and that pain had prevented him from performing work. (Doc. 34 at 10.) Defendant points to details of these issues that appear in the records of St. Vincent hospital, but allegedly cannot be found in the CMCHC medical record. (*Id.*)

12.     The medical record from CMCHC remains silent as to what Decker asked Gibson regarding the subject of exertion. The medical record simply states that Gibson could not relate his pain to a "particular food or activity." The statement falls short of Gibson claiming that he could not relate his pain to activity at all. Decker testified that Gibson denied that his pain was worse when he was working, doing ranch chores, or was physically active. (Decker Dep. Part I, Ex. 511, Doc. 62-12 at 53:1-12.) The Court considers this testimony in the absence of any support in the record and in light of Decker's questionable credibility. Decker's supervisor testified Decker was "not always truthful" and that Decker

"tends not to take responsibility for her actions," "particularly when her actions were ones that were coming under criticism or scrutiny." (Doc. 35 ¶ 23.)

13.     The CMCHC record also fails to reflect that Gibson reported that his chest pain had started a year earlier and had gotten progressively worse since spring. Gibson reported "fatigue and lack of energy." (*Id.* ¶ 1.) The Court remains mindful of the duty on Decker, as the medical provider, to recognize the heart issue based on the information that she *did have* and conduct a proper work up. Defendant has conceded that Decker's failure to recognize the heart issue, based on the information and history that she did have, legally caused Mr. Gibson's death. The parties agree that it is more probable than not that Gibson would have lived a normal life expectancy if he had received proper care from Decker and CMCHC. (Final Pretrial Order, Doc. 66 at 5.)

14.     Defendant acknowledges that Gibson told Decker, during his September 14, 2015, visit to the CMCHC that he "started getting a pain like someone pushing their finger between his shoulder blades," that he described "burning in his chest" and "that the pain started back about 1 year ago as heartburn" that "has gotten progressively worse since this spring." (Doc. 34 (citing SDF ¶ 24).) Decker testified about Gibson's presentation as follows:

> Q. …Is it fair to say [] based on your experience as a nurse practitioner, that
> the standard of care applicable to a certified nurse practitioner, such as

yourself, would have been to recognize that heart problems were part of the differential diagnosis in this patient?

A.    Yes.

Q. Would you agree that the standard of care would have also required recognizing that coronary issues were part of the differential diagnosis in this patient, whether the provider was a nurse practitioner or a primary medical doctor, or even a cardiologist?

A.    Yes.

…

Q. And would it be fair to say that the standard of care applicable to a certified nurse practitioner, such as yourself, would have been to do a basic workup to rule out heart problems, such as unstable angina, or acute coronary syndrome, or even an MI, subject, of course, to the patient giving consent?

A.    Yes.

Q. And that standard of care would be the same whether the provider was a nurse practitioner, primary M.D., cardiologist?

A.    Yes.

(Doc. 21-7; Decker Dep. Part 2, Ex. 512, Doc. 62-13 at 8:3-9:9.)


Q. …[W]ould you agree that the standard of care that applies to the nurse practitioner in this situation with this batch of symptoms and complaints required recommending a heart workup?

A.    Yes.

Q. And you would agree that failing to recommend an EKG in this situation would fall below the standard of care for nurse practitioners?

A.    Yes….

(*Id.* 28:14-22.)

15.     Defendant has confirmed that it violated the standard of care required to perform a heart work up *based on the information that Decker did have*. (Doc. 35 ¶¶ 10-14.) And, as noted above, Defendant has admitted negligence and causation. (*Id.* ¶ 22; Doc. 45 at 4-5; Final Pretrial Order, Doc. 66 at 4-5.) It seems undisputed that Decker possessed all the information that she needed to recognize a heart problem in Gibson and treat it properly. Moreover, Decker also testified that she actually thought Gibson's symptoms were "more likely" caused by his heart. (Decker Dep. Part 2, Ex. 512, Doc. 62-13 at 17: 4-5.)

16.     Decker possessed all the information that she needed for the standard of care to have required her to recognize and treat Gibson's heart disease. The alleged failure by Gibson to provide Decker with additional details cannot be shown to have had any causative effect. Defendant provided no witness opining that Gibson had been negligent in the history that he provided or that any basis exists for an assignment of comparative negligence on this point.

17.     Defendant next argues that Gibson acted negligently in failing to seek medical care between his visit to CMCHC and the call to the ambulance that took him to St. Vincent Hospital a week later. Defendant relies on a reference in the CMCHC medical record: "Follow up if the symptoms do not improve." (Doc. 21-11 at 8.) Defendant notes that Gibson continued to experience chest pain on the way to Winifred, Montana after having left CMCHC and that it was serious

enough that Barbara Gibson, who was driving, had to stop the car several times. (Doc. 35 ¶ 26.) Defendant also points out that Gibson continued to have pain and discomfort between his shoulders and that he appeared more tired in the week following his visit to CMCHC. (*Id.*) St. Vincent's September 21, 2015, operative report states that for "[t]he last 2 days [Gibson] was becoming short of breath and could only speak 1 or 2 words at a time." (Ex. 16, Doc. 62-2 at 14.)

18.     The medical record from CMCHC shows that Decker gave Gibson 40 hydrocodone tablets to be taken every 6 hours, as needed. The medical record states that "[*f*]*urther recommendations will be made based on the test results*." (Doc. 35 ¶ 2; Doc. 21-11 at 7 (emphasis added).)

19.     CMCHC performed the ultrasound on September 14, 2015, between 3:29 pm and 3:58 p.m. CMCHC radiology staff dictated the report that same day. (Doc. 21-11 at 9-10.) CMCHC transcribed the report two days later. (*Id.*) The ultrasound showed gallstones, but no cholecystitis (inflammation), thereby suggesting that the gallstones were not the cause of Gibson's pain. (*Id.*) Decker never followed up with Gibson. Decker assigned that task to nurse Kristine Moline five days later, on September 21, 2015. Decker commented on gallstones and fatty liver, but never suggested the need for a coronary work up. (*Id.* at 5.) Gibson had died by the time that Moline reached the Gibson family on September 24, 2015. The Court declines to assign negligence to Gibson under these circumstances.

## IV.     Economic Damages

20.     Montana Code Annotated § 27-1-203 provides that damages may be awarded "for detriment resulting after the commencement thereof or certain to result in the future." "The law of torts works to ensure that an award of damages restores an injured party as near as possible to the party's pre-tort position —no better, no worse." *Lampi v. Speed*, 261 P.3d 1000, 1004 (Mont. 2011).

### A. Gibson's Loss of Earning Capacity

21.     The Court agrees that Gibson's reasonable lost past and future earnings should be based on earning capacity based on Gibson's health, physical ability, and potential future earnings. The Court deems credible the testimony of Barbara Gibson that she and Johnny Gibson routinely underreported their actual income on their personal tax returns. These returns failed to report in-kind payments, including housing and food accommodations provided by Gibson's employer. In light of this testimony, the Court declines to limit Gibson's loss of past and future income to the amounts that Gibson actually reported on his personal tax returns as suggested by Defendant's expert Black.

22.     The Court believes, based in large part because of Plaintiffs' expert Adair's testimony, that $160,000 represents a reasonable amount to compensate the Estate of Johnny Gibson for the loss of his past and future earnings. Federal Rule of Evidence (FRE) 702 governs testimony of expert witnesses. The Ninth

Circuit requires testimony to be both relevant and reliable under FRE 702. *See Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (en banc). FRE 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), seek "to protect juries from being swayed by dubious scientific testimony." *United States v. Flores*, 901 F.3d 1150, 1165 (9th Cir. 2018) (quoting *David E. Watson, P.C. v. United States*, 668 F.3d 1008, 1014 (8th Cir. 2012)); *see id.* (collecting cases). But when, as here, the Court holds a bench trial, "there is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself." *Id.* A court may in those circumstances "make its reliability determination during, rather than in advance of, trial." *Id.* (quoting *In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006)). The Court followed that procedure here.

23.     The Supreme Court outlined a number of factors that Court's may consider when determining if an expert should be allowed to testify under *Daubert* and FRE 702. But district courts "are not required to consider all (or even any) of these factors." *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1189 (9th Cir. 2019). Courts can allow experts to testify under *Daubert* and FRE 702 as long as they do not "abandon the gatekeeping function' altogether." *Id.* (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 158-59 (1999) (Scalia, J., concurring)).  At minimum, courts must "make an explicit reliability finding." *United States v. Jawara*, 474 F.3d 565, 583 (9th Cir. 2007).

23

24.     Under *Daubert* and FRE 702, Adair provided reliable and relevant testimony as related to loss of future income for Gibson. Adair has been doing wrongful death economic loss projections for over a decade. (Trial Tr. Vol. 1, Doc. 64 at 162:10-11.) The Court has little reason to doubt the reliability of her testimony on this topic. The Court more fully addresses below how Adair's testimony related to the value of a statistical life was not reliable.

## B.  Loss of Household Services

25.     The parties agree that the Estate of Johnny Gibson is due an award for loss of household services totaling $144,434.

## C.  Funeral and Burial Expenses

26.     The parties agree that the Estate of Johnny Gibson is due an award loss for documented funeral and burial expenses totaling $8,814.

## D.  Gibson's Loss of Future Benefits

27.     An award of damages in the adjusted amount of $15,000 to be reasonable to compensate for the loss of future benefits to Gibson.

## E.  Medical Expenses

28.     The parties agree that St. Vincent Healthcare initially billed Gibson $165,651.50 for medical expenses. The parties also agree that St. Vincent Healthcare wrote off the entire $165,651.50 amount based on a description in its bill as "CHARITY – BELOW FPG[.]" (Ex. 32, Doc. 62-4 at 13.) The parties

disagree as the effect of this write-off. This Court has recognized that plaintiffs are not entitled to recover medical expenses in excess of the amount actually paid. *Willink v. Boyne USA, Inc.*, No. CV 12-74-BU-DLC, 2013 WL 5756157, at *2 (D. Mont. Oct. 23, 2013). *Willink* relied on decisions of the Montana Supreme Court to that same effect. *See id.* (citing *Conway v. Benefis Health Sys.*, 297 P.3d 1200 (Mont. 2013), and *Newbury v. State Farm Fire & Cas. Ins. Co.*, 184 P.3d 1021 (Mont. 2008)).

29.     *Newbury* and *Conway* analyzed the scope of medical payments coverage under insurance policies. Their reasoning proves instructive here. The Montana Supreme Court in *Newbury* faced a claim by a snowplow driver who had been injured on the job while attempting to assist a stranded motorist. The injured worker filed a claim with his worker's compensation insurer. The worker's compensation insurer paid all except $1,175 of the medical bill. *Newbury*, 184 P.3d at 1023. The injured worker then sought to recover from his automobile insurance provider the full $10,000 policy limit for medical bills. *Id.* The automobile insurer paid the outstanding $1,175, but refused to pay the full $10,000 policy limit. *Id.* The injured worker appealed. The Montana Supreme Court determined that it may have been reasonable for the injured worker to "expect that his [automobile insurance] policies would pay his medical expenses (up to the policy limits of $10,000.00) once the [worker's compensation insurer] had paid all that it was

25

required to pay." *Id.* at 1028. By contrast, the Montana Supreme Court determined

that "it was not reasonable for [the injured worker] to expect to receive funds in

excess of his medical expenses." *Id.*

30.     The plaintiff in *Conway* brought a breach of contract claim against his

medical provider. The plaintiff's medical costs totaled $2,073.65. *Conway*, 297

P.3d at 1202. The medical provider billed the plaintiff's health insurer and

automobile insurer. *Id.* The health insurer had entered into multiple agreements

with medical providers to accept reduced payments for medical services. *Id.* The

medical provider accepted $662.74 as payment, in full, from the plaintiff's health

insurer under the terms of its preferred provider agreement. *Id.* The plaintiff's

automobile insurer then paid the medical provider $1,866.29. *Id.* The medical

provider promptly refunded the $662.74 back to plaintiff's health insurer. *See id.*

The plaintiff sought to recover the difference between the $1,866.29 that his

medical provider had accepted for payment from the automobile insurer and the

$662.74 paid under a preferred provider agreement with the insurer. *Id.* at 1206.

*Conway* rejected the notion that the plaintiff was entitled "to pocket excess medical

payments." *Id.* at 1207.

31.     *Meek v. Montana Eighth Judicial District Court*, 349 P.3d 493 (Mont.

2015), has no application here. The plaintiff in *Meek* sought a writ of supervisory

control to address the district court's order that precluded admission of the

plaintiff's medical bills due to its determination that the bills from health care providers are "not a reliable or accurate indicator of the reasonable value of the services" as they routinely get inflated and "few patients ever actually pay the billed amount." *Id.* at 495. The Montana Supreme Court made clear that it addressed solely the question of "whether the district court properly limited the evidence that is admissible at trial regarding medical expenses." *Id.* The Montana Supreme Court granted the writ when it concluded that "medical bills received by a tort victim can be relevant evidence of issues such as the nature and severity of the injuries, and of the medical procedures and treatments that were required." *Id.* (citing *Chapman v. Mazda Motor of Am.*, 7 F. Supp. 2d 1123, 1125 (D. Mont. 1998) (denying Defendant's motion to exclude evidence of plaintiff's medical bills on relevancy grounds)).

32.     The Court admitted evidence of Gibson's medical bills at trial. (*See* Ex. 31, Doc. 62-3 and Ex. 32, Doc. 62-4.) The Court considered the amount of these medical bills–$165,651.50–in evaluating the nature and severity of Johnny Gibson's injuries stemming from the negligence of Defendant. *Chapman*, 7 F. Supp. 2d at 1125. Gibson died as a result of the Defendant's negligence. The Court also considered the fact that St. Vincent's Healthcare wrote off these medical bills in determining the amount that the Estate of Johnny Gibson should recover for injuries related to the negligence of Defendant. The Court adopts the reasoning of

*Newbury* and *Conway* and declines to award the Estate of Johnny Gibson damages based on medical expenses written off by St. Vincent Healthcare.

### F. Total Economic Damages

33.     The Estate of Johnny Gibson's economic damages total $328,248.

### V.     Noneconomic Damages

### A. Physical and Emotional Distress

34.     Evidence at trial demonstrated that Gibson experienced physical and emotional distress prior to his death. The evidence at trial also indicated that Gibson likely would have experienced similar physical and emotion distress in the absence of any negligence by Defendant and that Gibson would have faced a similar treatment one week earlier had Decker properly diagnosed Gibson's symptoms. The Court awards no compensation for this element of damage under these circumstances.

### B. Testimony Regarding the Value of a Statistical Life

35.     Plaintiffs sought to admit the testimony of Adair regarding "value of a statistical life for purposes of assessing Plaintiffs' damages." (Doc. 25.) Plaintiffs maintained that the testimony should be admitted for purposes of calculating other non-economic damages. (Doc. 37.) Defendant objected on the grounds that such testimony was not relevant or reliable.

36.     Federal Rule of Evidence (FRE) 702 governs testimony of expert

witnesses. The Ninth Circuit requires testimony to be both relevant and reliable

under FRE 702. *See Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463

(9th Cir. 2014) (*en banc*). FRE 702 and *Daubert v. Merrell Dow Pharmaceuticals,

Inc.*, 509 U.S. 579 (1993), seek "to protect juries from being swayed by dubious

scientific testimony." *United States v. Flores*, 901 F.3d 1150, 1165 (9th Cir. 2018)

(quoting *David E. Watson, P.C. v. United States*, 668 F.3d 1008, 1014 (8th Cir.

2012)); *see id.* (collecting cases). But when, as here, the Court holds a bench trial,

"there is less need for the gatekeeper to keep the gate when the gatekeeper is

keeping the gate only for himself." *Id.* A court may in those circumstances "make

its reliability determination during, rather than in advance of, trial." *Id.* (quoting *In

re Salem*, 465 F.3d 767, 777 (7th Cir. 2006)). The Court followed that procedure

here.

37.     Adair testified that she had examined what she described as the

positions of the U.S. Department of Transportation and the EPA with respect to the

value of human life for cost-benefit decision making. (Trial Tr. Vol. 1, Doc. 64 at

181:5-13.) Adair characterized the federal agencies' studies as "what people think

the value of their own life is . . .." (*Id.* at 181:23-25; *see also id.* at 186:5-8.) Adair

also characterized the measure as "what they would be willing to pay to reduce the

risk of the loss of that life." (*Id.* at 181:25-182:2.)

38.     Adair described the agencies' methodology as either revealed

preference or stated preference theory. (*Id.* at 182:10-16.) Adair described revealed

preference theory as the premium that workers require in order to take substantially

more dangerous jobs or the premium people are willing to pay for insurance, safety

gear, and safer products. (*See id.* at 182:16-25.) Adair described stated preference

as studies that ask individuals what they would do to avoid certain risks and then

impute a value. (*See id.* at 183:5-9.)

39.     According to Adair, the U.S. Department of Transportation used an

average figure of $9.6 million for the value of a human life in 2016. (*See id.* at

185:19-186:8.) The Department of Transportation study cited by Adair provides,

however, that the benefit of preventing a fatality "is measured by what is

conventionally called the Value of a Statistical Life (VSL), defined as the

additional cost that individuals would be willing to bear for improvements in safety

(that is, reductions in risks) that, in the aggregate, reduce the expected number of

fatalities by one. This conventional terminology has often provoked

misunderstanding on the part of both the public and decision-makers. What is

involved is not the valuation of life as such, but the valuation of reductions in

risks." (Ex. 35, Doc. 60-23 at 2 (emphasis added).)

40.     The EPA study that Adair cites provides that "[t]he EPA does not

place a dollar value on individual lives. Rather, when conducting a benefit-cost

analysis of new environmental policies, the Agency uses estimates of how much people are willing to pay for small reductions in their risks of dying from adverse health conditions that may be caused by environmental pollution." (Ex. 36, Doc. 60-24 at 1.)

41.    Adair has no information that the Department of Transportation or the EPA uses its figures for any kind of compensation in tort litigation. (Trial Tr. Vol. 2, Doc. 65 at 230:23-231:10.)

42.    Various courts, including the Ninth Circuit, have expressed skepticism toward the type of testimony presented by Adair. *See, e.g.*, *Dorn v. Burlington N. Santa Fe R.R. Co.*, 397 F.3d 1183, 1195 (9th Cir. 2005). The Ninth Circuit recognized that the fact "[t]hat a government safety program costs a certain amount per life saved, or that the government requires purchase of a certain kind of safety equipment, may suggest a collective policy judgment the government has made, or may represent a policy selected for reasons other than the cost-benefit analysis 'hedonic analysis' implies, or even a mistaken policy." *Id.* The Seventh Circuit likewise has expressed "serious doubts" about the assertion these government studies "actually measure how much Americans value life." *Mercado v. Ahmed*, 974 F.2d 863, 871 (7th Cir. 1992).

43.    The district court in *Starling v. Banner Health*, No. CV-16-00708-PHX-NVW, 2018 WL 1015470 (D. Ariz. 2018), recently addressed the

admissibility of this type of testimony. The district court, in excluding the

testimony, highlighted the many variables potentially considered in these

government studies:

> government calculations about how much to spend (or force others to
> spend) on health and safety regulations are motivated by a host of
> considerations other than the value of life: [I]s it an election year?
> [H]ow large is the budget deficit? [O]n which constituents will the
> burden of the regulations fall? [W]hat influence and pressure have
> lobbyists brought to bear? [W]hat is the view of interested constituents?
> And so on.

*Id.* at *3 (quoting *Mercado*, 974 F.2d at 871). The Court determines Adair's

testimony on this issue not relevant or reliable. The Court exercises its gatekeeper

role to exclude Adair's testimony regarding the value of a statistical life. Adair's

testimony on this issue failed to satisfy the standards of reliability and relevance as

required under FRE 702 and *Daubert.*

## VI.     Gibson's Heirs

44.     Wrongful death damages also include reasonable compensation for

grief, sorrow and mental anguish. *See Hern v. Safeco Ins. Co. of Ill.*,  125 P.3d 597,

609 (Mont. 2005) (quoting *Busta v. Columbus Hosp. Corp.*, 916 P.2d 122, 129

(1996) and citing *Estate of Spicher v. Miller*,861 P.2d 183 (Mont. 1993); *Dawson

v. Hill & Hill Truck Lines*, 671 P.2d 589 (Mont. 1983); *see also* Mont. Pattern

Instr. (Civil) 25.22 (2d 2003) ("reasonable compensation for grief, suffering and

mental anguish" may be awarded in wrongful death actions) (citing, *inter alia*,

*Ewalt v. Scott*, 675 P.2d 77 (Mont. 1985)).

45.     In Montana, adult children may receive compensation in limited

circumstances for loss of consortium in a case involving serious tortious injury to

the parent. *N. Pac. Ins. Co. v. Stucky*, 338 P.3d 56, 61 (Mont. 2014). A court

should consider the following factors in determining whether to award damages for

loss of consortium: the child's age; the nature of the child's relationship with the

parent; and the child's emotional, physical and geographic characteristics. *See id*. at

65. *Stucky* recognized that "the nature of the parent-child relationship may change

when the child reaches adulthood." *Id.* The Montana Supreme Court nevertheless

understood that this relationship did "not evaporate upon reaching the age of

majority." *Id. Stucky* cited the change or re-emergence of the adult child's need for

a parent's guidance "as the child confronts the different obstacles he or she meets

in new phases of life." *Id.* As an "independent person who is expected to navigate

his or her own way through life" the adult child's path may be illuminated and

smoothed by the benefit of a parent's wisdom, love and insight. *Id.*

46.     A plaintiff must establish the following elements to succeed on a

cause of action for loss of consortium: "1) a third party tortiously caused the parent

to suffer a serious, permanent and disabling mental or physical injury compensable

under Montana law; and 2) the parent's ultimate condition of mental or physical

impairment is so overwhelming and severe that it has caused the parent-child relationship to be destroyed or nearly destroyed." *Id*. at 66.

### A. Barbara Gibson

47.     Barbara Gibson remained married to Gibson at the time of his death. She spent every day with him. She testified poignantly to their romantic relationship and the enduring loss that she has felt since his death. She also relied on Gibson for emotional support and guidance.

48.     Barbara Gibson qualifies for noneconomic damages, including but not limited to grief and loss of consortium, totaling $145,000, which equates to approximately 45 percent of the economic damages.

### B. Dixie Lee Gibson

49.     Dixie Lee Gibson lived with her parents at the time of Gibson's death. She too relied on Gibson for emotional support and guidance. Her loss differs from that felt by Barbara Gibson in that she did no share Gibson as a life partner.

50.     Dixie Lee Gibson qualifies for noneconomic damages, including but not limited to grief, totaling $70,000, which equates to approximately 21 percent of the economic damages.

### C. John Travis Gibson

51.     John Travis Gibson remained close to his father at the time of Gibson's death. John Travis relied on Gibson for advice and some companionship.

Gibson had married, however, moved out of the family home, and started a family by the time of Gibson's death. He did not rely directly on Gibson as the head of the household as John Travis had his own household and separate career at the time of Gibson's death.

52.     John Travis Gibson qualifies for noneconomic damages, including but not limited to grief, totaling $35,000, which equates to approximately 10 percent of the economic damages.

53.     These differences in award amounts reflect the different life circumstances of each of Gibson's heirs and the differing nature of their relationships with Gibson at the time of his death.

## ORDER

Accordingly, **IT IS HEREBY ORDERED**, under Federal Rule of Civil Procedure 58, that the Clerk of Court enter judgment by separate document in favor of the Plaintiffs as follows:

1.  The Estate of Johnny G. Gibson is granted judgment against Defendant in the amount of $183,814.00.

2.  Barbara Gibson is granted judgment against Defendant in the amount of $289,434.00.

3.  Dixie Lee Gibson is granted judgment against Defendant in the amount of $70,000.00.

4. John Travis Gibson is granted judgment against Defendant in the amount of <u>$35,000.00</u>.

**IT IS FURTHER ORERED** that Defendant's Motion to Alter the Judgment (Doc. 75) is **GRANTED**, in part, and **DENIED**, in part; and

In light of the amended findings of fact and conclusions of law, Plaintiffs' Motion for Declaratory *Ridley* Ruling. (Doc. 84.) is **DENIED** without prejudice.

DATED this 6th day of April, 2020.


_____
Brian Morris, Chief District Judge
United State District Court